**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**CHARLESTON DIVISION**

**EDWARD EUGENE BAYS, JR.,**

       **Plaintiff,**

**v.**                         **Case No.: 2:14-cv-01564**

**CAROLYN W. COLVIN,
Acting Commissioner of
Social Security,**

       **Defendant.**

## PROPOSED FINDINGS AND RECOMMENDATIONS

      This action seeks a review of the decision of the Commissioner of the Social Security Administration (hereinafter "Commissioner") denying Plaintiff's applications for a period of disability and disability insurance benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401-433, 1381-1383f. The matter is assigned to the Honorable Thomas E. Johnston, United States District Judge, and was referred to the undersigned United States Magistrate Judge by standing order for submission of proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B). Presently pending before the Court are Plaintiff's brief requesting judgment on the pleadings and the Commissioner's brief in support of her decision requesting judgment in her favor. (ECF Nos. 12 & 13).

      The undersigned has fully considered the evidence and the arguments of

counsel. For the following reasons, the undersigned **RECOMMENDS** that Plaintiff's request for judgment on the pleadings be **DENIED**, the Commissioner's request for judgment on the pleadings be **GRANTED**, the Commissioner's decision be **AFFIRMED,** and that this case be **DISMISSED** and removed from the docket of the Court.

## I.  <u>Procedural History</u>

On March 6, 2011 and May 16, 2011, Plaintiff Edward Eugene Bays, Jr., ("Claimant"), filed applications for DIB and SSI, respectively, alleging a disability onset date of June 15, 2010, (Tr. at 149, 152), due to "back injury, leg numbness, and nerve damage." (Tr. at 189). The Social Security Administration ("SSA") denied Claimant's applications initially and upon reconsideration. (Tr. at 60, 71, 83, 87). Claimant then filed a request for an administrative hearing, (Tr. at 104), which was held on October 3, 2012 before the Honorable William Paxton, Administrative Law Judge ("ALJ"). (Tr. at 29-53). By written decision dated October 12, 2012, the ALJ found that Claimant was not disabled as defined in the Social Security Act. (Tr. at 12-22). The ALJ's decision became the final decision of the Commissioner on November 18, 2013, when the Appeals Council denied Claimant's request for review. (Tr. at 1-4).

Claimant timely filed the present civil action seeking judicial review pursuant to 42 U.S.C. § 405(g). (ECF No. 2). The Commissioner subsequently filed an Answer opposing Claimant's complaint and a Transcript of the Administrative Proceedings. (ECF Nos. 8 & 9). Claimant filed a Brief in Support of Judgment on the Pleadings, (ECF No. 12), and the Commissioner then filed a Brief in Support of Defendant's Decision, (ECF No. 13), to which Claimant filed a reply. (ECF No. 14). Consequently, the matter is fully briefed and ready for resolution.

## II.     Claimant's Background

Claimant was 45 years old at the time that he filed the instant applications for benefits, and 46 years old on the date of the ALJ's decision. (Tr. at 20, 149, 152). He has a ninth grade education and communicates in English. (Tr. at 20, 32). Claimant has previously worked as a truck driver, ATM machine servicer, and alarm technician wire installer. (Tr. at 20, 35-36, 204-11).

## III.     Summary of the ALJ's Decision

Under 42 U.S.C. § 423(d)(5), a claimant seeking disability benefits has the burden of proving a disability. *See Blalock v. Richardson,* 483 F.2d 773, 775 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

The Social Security Regulations establish a five step sequential evaluation process for the adjudication of disability claims. If an individual is found "not disabled" at any step of the process, further inquiry is unnecessary and benefits are denied. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). The first step in the sequence is determining whether a claimant is currently engaged in substantial gainful employment. *Id.* §§ 404.1520(b), 416.920(b). If the claimant is not, then the second step requires a determination of whether the claimant suffers from a severe impairment. *Id.* §§ 404.1520(c), 416.920(c). A severe impairment is one that "significantly limits [a claimant's] physical or mental ability to do basic work activities." *Id.* If severe impairment is present, the third inquiry is whether this impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P

of the Administrative Regulations No. 4 (the "Listing"). *Id.* §§ 404.1520(d), 416.920(d). If so, then the claimant is found disabled and awarded benefits.

However, if the impairment does not meet or equal a listed impairment, the adjudicator must assess the claimant's residual functional capacity ("RFC"), which is the measure of the claimant's ability to engage in substantial gainful activity despite the limitations of his or her impairments. *Id.* §§ 404.1520(e), 416.920(e). After making this determination, the fourth step is to ascertain whether the claimant's impairments prevent the performance of past relevant work. *Id.* §§ 404.1520(f), 416.920(f). If the impairments do prevent the performance of past relevant work, then the claimant has established a *prima facie* case of disability, and the burden shifts to the Commissioner to demonstrate, in the fifth and final step of the process, that the claimant is able to perform other forms of substantial gainful activity, given the claimant's remaining physical and mental capacities, age, education, and prior work experiences. 20 C.F.R. §§ 404.1520(g), 416.920(g); *see also McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983). The Commissioner must establish two things: (1) that the claimant, considering his or her age, education, skills, work experience, and physical shortcomings has the capacity to perform an alternative job, and (2) that this specific job exists in significant numbers in the national economy. *McLamore v. Weinberger*, 538 F.2d 572, 574 (4th Cir. 1976).

Here, the ALJ determined as a preliminary matter that Claimant met the insured status for disability insurance benefits through September 30, 2010. (Tr. at 14, Finding No. 1). At the first step of the sequential evaluation, the ALJ confirmed that Claimant had not engaged in substantial gainful activity since June 15, 2010, the alleged disability onset date. (Tr. at 14, Finding No. 2). At the second step of the

evaluation, the ALJ found that Claimant had the following severe impairments: "lumbar disc disease, lumbar radiculopathy, and right tibial and peroneal neuropathy." (Tr. at 14-16, Finding No. 3). The ALJ also considered Claimant's other impairments, including a history of hemoptysis, carpal tunnel syndrome in the right hand, hypertension, and depression. (Tr. at 15). However, he found that these impairments were non-severe. (*Id.*)

Under the third inquiry, the ALJ found that Claimant did not have an impairment or combination of impairments that met or medically equaled any of the impairments contained in the Listing. (Tr. at 16, Finding No. 4). Accordingly, he determined that Claimant possessed:

> [T]he residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except the claimant is limited to standing and walking a total of three hours in an eight-hour day. The claimant can never perform climbing of ladders, ropes, or scaffolds, or crawling, and can occasionally perform stooping, crouching, kneeling, and climbing of ramps and stairs. He must avoid concentrated exposure to extreme cold, vibration, and hazards, such as heights and machinery. He would need a sit/stand option, and can stand for fifteen minutes without interruption and sit for thirty minutes without interruption.

(Tr. at 17-20, Finding No. 5). At the fourth step, the ALJ determined that Claimant was unable to perform any past relevant work. (Tr. at 20, Finding No. 6). Under the fifth and final inquiry, the ALJ reviewed Claimant's past work experience, age, and education in combination with his RFC to determine his ability to engage in substantial gainful activity. (Tr. at 20-21, Finding Nos. 6-10). The ALJ considered that (1) Claimant was born in 1966, and was defined as a younger individual age 18-49; (2) he had a limited education and could communicate in English; and (3) transferability of job skills was not an issue because using the Medical-Vocational Rules as a framework supported a finding that the Claimant is "not disabled,"

whether or not the Claimant had transferable job skills. (Tr. at 20, Finding Nos. 7-9). Given these factors, Claimant's RFC, and the testimony of a vocational expert, the ALJ determined that Claimant could perform jobs that exist in significant numbers in the national economy, (Tr. at 20-21, Finding No. 10), including work as a rental clerk in a storage facility and mail sorter at the light exertional level, and document preparer at the sedentary exertional level. (Tr. at 21). Therefore, the ALJ concluded that Claimant was not disabled as defined in the Social Security Act, and thus was not entitled to benefits. (Tr. at 21-22, Finding No. 11).

## IV.    Claimant's Challenge to the Commissioner's Decision

Claimant raises a single challenge to the Commissioner's decision. Specifically, he insists that the ALJ incorrectly assigned greater weight to the opinion of a non-examining medical source, Fulvio Franyutti, M.D., than to the opinion of Claimant's treating physician, Michael Shramowiat, M.D. (ECF No. 12 at 6, 8-10). Claimant particularly takes issue with the ALJ's rejection of Dr. Shramowiat's opinion that he could only sit for a total of four hours in an eight-hour workday. (*Id.* at 8). In rejecting this portion of Dr. Shramowiat's opinion, Claimant argues that the ALJ relied too heavily on recent treatment records rather than analyzing the medical records as a whole and considering them over time. (*Id.* at 8-9). According to Claimant, the ALJ seized upon a few notations that Claimant's symptoms of pain were being successfully controlled on medication and extrapolated from these notes that Claimant's physical limitations must have significantly improved. (*Id.* at 8). Claimant also argues that the ALJ's assignment of significant weight to Dr. Franyutti's opinion contradicted his assignment of no weight to the RFC Assessment completed by Single Decisionmaker ("SDM") Daniel A. Scott, because Dr. Franyutti

merely affirmed Mr. Scott's RFC Assessment as written. (ECF No. 12 at 9-10). Finally, Claimant alleges that the ALJ failed to provide "good reasons" for discounting Dr. Shramowiat's opinion, and as such, a subsequent reviewer would not understand the rationale underlying the ALJ's treatment of that opinion. (*Id.* at 8-9; ECF No. 14 at 2).

In response, the Commissioner asserts that substantial evidence supports the ALJ's RFC finding and that the ALJ thoroughly discussed Claimant's treatment records and testimony. (ECF No. 13 at 9-11). In addition, the Commissioner argues that the ALJ correctly rejected Dr. Shramowiat's opinion that Claimant could only sit for a total of four hours in an eight-hour workday as that opinion was inconsistent with the objective medical evidence, including Dr. Shramowiat's own treatment records. (*Id.* at 12-14). As for the ALJ's analysis of Dr. Franyutti's opinion, the Commissioner contends that the ALJ properly assigned significant weight to Dr. Franyutti's opinion because it was "consistent with the record as a whole." (*Id.* at 15). The Commissioner points out that, even though Dr. Franyutti's opinion was assigned significant weight, the ALJ still concluded that Claimant was more functionally limited than Dr. Franyutti had opined, which benefited Claimant. (*Id.*) Finally, the Commissioner insists that an ALJ may properly rely on an RFC Assessment by a "lay state agency employee" if the Assessment is later affirmed by a state agency physician. (*Id.*)

## V.   **Relevant Medical Evidence**

The undersigned has reviewed the evidence in its entirety, including all of the medical records, and summarizes the relevant records below.

### A. Treatment Records

On April 12, 2004, Claimant presented to the emergency department at

Camden-Clark Memorial Hospital for a complaint of experiencing electrical shock while at work. (Tr. at 295). Claimant reported that while holding wire strippers, he came in contact with a live wire. (*Id.*) Claimant pushed away from the live wire, which caused him to fall across an elevator shaft. (*Id.*) The triage nurse recorded that Claimant exhibited some residual spasm of the right upper extremity. (*Id.*) Claimant's primary complaint was bilateral shoulder and upper back discomfort, which could be attributed to either the electric shock or the subsequent fall. (*Id.*) Paul D. Steinman, D.O., examined Claimant and found that he was alert, in no acute distress, and able to answer questions using complete sentences. (*Id.*) Dr. Steinman's physical examination of Claimant was unremarkable. (*Id.*) He noted that Claimant's cranial nerves II through XII were grossly intact with no focal deficits. (*Id.*) Dr. Steinman's differential diagnosis included simple electric contact versus deep electrical burns. (*Id.*) A cardiac panel, EKG, and urinalysis were performed to determine any muscle involvement and possible cardiac damage. (*Id.*) Claimant was discharged in good condition with a diagnosis of electrical shock, and he was prescribed ibuprofen. (*Id.*)

On October 13, 2004, Claimant underwent an MRI of the lumbar spine at Camden-Clark Memorial Hospital. (Tr. at 297). The MRI revealed a small focal disc protrusion at the L5-S1 level that created no significant central narrowing or neural foraminal narrowing. (*Id.*) The remainder of the examination showed no focal abnormality. (*Id.*)

On January 5, 2005, Dr. Shramowiat performed electromyography ("EMG") studies on Claimant's lower extremities and a nerve root search to evaluate lumbar radiculopathy verses neuropathy. (Tr. at 325). Dr. Shramowiat recorded that Claimant complained of pain and numbness in both of his lower extremities. (*Id.*)

8

Test results revealed that Claimant's left tibial motor latency was prolonged, his left sural sensory latency was borderline normal, and the remainder of the nerve conduction study of Claimant's lower extremities was normal. (Tr. at 326). The needle EMG of the lower extremities was also normal. (*Id.*) Dr. Shramowiat assessed Claimant with left tibial and sural neuropathy. (*Id.*)

On January 26, 2005, Dr. Shramowiat conducted an EMG study of Claimant's upper extremities due to Claimant's complaints of neck pain along with pain and numbness in both upper extremities. (Tr. at 319, 322). Test results revealed that Claimant's right median motor and sensory latency was prolonged. (Tr. at 324). Dr. Shramowiat found that the remainder of the nerve conduction study of Claimant's upper extremities was normal as was the needle EMG of his upper extremities. (*Id.*) Claimant was assessed with right carpal tunnel syndrome. (Tr. at 319, 324). Claimant's treatment plan included continuing his current medications and making a follow-up appointment. (Tr. at 319).

Claimant returned to Dr. Shramowiat on February 15, 2005 as a follow-up to his workers' compensation claim related to the electrical shock. (Tr. at 318). He continued to complain of low back pain with numbness and tingling in his bilateral lower extremities. (*Id.*) Dr. Shramowiat's physical examination of Claimant revealed that he had bilateral lower extremity strength of 5/5. (*Id.*) Dr. Shramowiat observed that Claimant's sensation was grossly intact and symmetrical for light touch. (*Id.*) Claimant's deep tendon reflexes were 2+ at the patella and Achilles bilaterally. (*Id.*) Straight leg raising tests were negative for both of Claimant's legs. (*Id.*) Dr. Shramowiat indicated that Claimant complained of moderate pain, but no abnormal tightness was noted throughout the lumbar area. (*Id.*) Dr. Shramowiat instructed

Claimant to continue using Ultram and Soma, which Claimant stated provided him good symptom relief and no side effects. (*Id.*) Claimant was also instructed to continue performing home exercises and to use ice as necessary. (*Id.*)

On March 22, 2005, Claimant again presented to Dr. Shramowiat for a follow-up to his workers' compensation claim. (Tr. at 317). He continued to report low back pain, numbness and tingling in the anterolateral aspect of the right upper leg, and carpal tunnel symptoms on his right side, including pain, numbness, and tingling in the right hand. (*Id.*) Claimant's medications at that time included Ultram and Soma, with the latter taken at night; however, Claimant reported better relief from his symptoms, as well as better rest, by taking only Vicodin at night and not any using medication during the day. (*Id.*) He also stated that he continued to perform home exercises. (*Id.*) Dr. Shramowiat's physical examination of Claimant revealed that he had bilateral lower extremity strength of 5/5. (*Id.*) Dr. Shramowiat observed that Claimant had numbness at the anterolateral aspect of the right upper leg. (*Id.*) Straight leg raising tests were negative bilaterally. (*Id.*) Dr. Shramowiat recorded that there appeared to be some mild to moderate tenderness with palpation over Claimant's mid thoracic area on the right and over Claimant's lumbar area bilaterally. (*Id.*) Dr. Shramowiat further indicated that Claimant's bilateral upper strength was 5/5 with sensation grossly intact and symmetrical to light touch in both upper extremities. (*Id.*) Claimant's treatment plan included a discontinuation of Ultram and Soma to be replaced with Vicodin 5 mg. (*Id.*) Dr. Shramowiat recommended that Claimant continue home exercises and use of ice as needed. (*Id.*) He determined that Claimant was able to return to work on medium duty, and he completed a form for an occupational resource specialist noting that Claimant might require vocational

rehabilitation and job search assistance in order to return to work. (*Id.*)

Claimant next treated with Dr. Shramowiat on May 1, 2006. (Tr. at 315). Claimant complained of neck pain with variable levels of intensity as well as pain and numbness in his bilateral upper extremities. (*Id.*) In addition, Claimant reported constant low back pain, numbness in the right lower extremity, and a shooting pain that radiated from the low back to between his shoulder blades. (*Id.*) He also stated that driving aggravated his neck and lower back symptoms. (*Id.*) Claimant indicated that he was not taking any medication at that time. (*Id.*) Upon physical examination, Dr. Shramowiat observed that Claimant's gait was grossly normal. (*Id.*) Dr. Shramowiat recorded that Claimant's bilateral upper extremity strength and bilateral lower extremity strength were 5/5. (*Id.*) Straight leg raising tests were negative in both legs, and Claimant's wrists were both negative for Tinel's sign. (*Id.*) Dr. Shramowiat diagnosed Claimant with mild lower cervical paraspinal tightness bilaterally and moderate to severe right rhomboid tightness. (*Id.*) Dr. Shramowiat also observed that Claimant had moderate lower lumbar paraspinal tightness and that he reported of tenderness at approximately L5-S1. (*Id.*) Dr. Shramowiat recorded that Claimant's workers' compensation claim had been closed and that he had presented a claim re-opening form at the appointment. (*Id.*) Claimant's treatment plan included ice for pain relief and continuation of a home exercise program. (*Id.*) Dr. Shramowiat noted that he would like an MRI performed on Claimant's cervical spine due to Claimant's reports of chronic neck pain and arm numbness. (*Id.*)

The next medical record in evidence is dated nearly four years later. On April 5, 2010, Claimant presented to the Emergency Department at Camden-Clark Memorial Hospital complaining of low back pain that radiated to the right leg. (Tr. at

259). He also described numbness and tingling. (*Id.*) Claimant reported that the problem began one month prior to his visit, when he slipped and fell on ice, but that the pain had resolved until two days prior to his visit when he was playing basketball. (*Id.*) At that time, Claimant began experiencing low back pain with tingling in the right lower extremity. (*Id.*) He reported that he had experienced similar episodes in the past, but this time the symptoms were worse and lasted longer. (*Id.*) Anthony Kitchen, M.D., observed that Claimant's neck was negative for injury, pain, and swelling; however, Claimant's back was positive for decreased range of motion as well as radiating pain at rest and with movement. (Tr. at 260). All other systems were normal. (Tr. at 260-61). Dr. Kitchen noted that Claimant's back was negative for vertebral tenderness or costovertebral angle tenderness. (Tr. at 260). He also indicated that Claimant's extremities were negative for muscle weakness, pain, joint stiffness, instability, and redness. (*Id.*) Dr. Kitchen's examination of Claimant revealed that his neck was supple with full range of motion and without nuchal rigidity or vertebral tenderness. (*Id.*) Dr. Kitchen also recorded that Claimant's motor strength in all extremities was 5/5. (*Id.*) Claimant's gait was observed to be normal. (*Id.*) Dr. Kitchen noted pain in Claimant's low back area and painful range of motion in the low back with all movement. (Tr. at 260-61). Dr. Kitchen also observed that Claimant had normal spinal alignment with neither costovertebral angle tenderness nor vertebral tenderness. (Tr. at 261). Claimant was unable to perform straight leg raises due to pain, and his right lower extremity was slightly weaker on leg lifts. (*Id.*) Dr. Kitchen indicated that Claimant's muscle tone was normal in all extremities with no obvious gross deficits. (*Id.*) An x-ray of the lumbar spine performed that day revealed mild arthritic changes of the vertebral bodies and early findings of

degenerative disc disease at L5-S1 with no evidence of acute congenital anomaly. (Tr. at 258). Dr. Kitchen determined that Claimant suffered from back pain with sciatica. (Tr. at 259). Claimant was given prescriptions for Medrol and Lortab, and he was discharged in stable condition. (*Id.*)

On April 15, 2010, Claimant returned to Dr. Shramowiat complaining of low back pain, and pain and numbness in his right lower extremity. (Tr. at 276). Claimant reported he experienced a constant dull ache in his low back. (*Id.*) He also indicated that his low back pain was exacerbated by sitting and standing, and that he felt best when lying down. (*Id.*) Claimant informed Dr. Shramowiat that he was working as a truck driver at that time, which required a lot of lifting. (*Id.*) Upon physical examination, Dr. Shramowiat recorded that Claimant's lower extremity strength was 5/5. (Tr. at 277). Dr. Shramowiat also observed that sensation was diminished in Claimant's right L5 nerve root distribution. (*Id.*) Dr. Shramowiat indicated that Claimant had moderate muscle tightness in his lumbar paravertebral region bilaterally and some paresthesias in the peroneal nerve root distribution. (*Id.*) Claimant also had diminished light touch sensation at the right lateral femoral cutaneous nerve root distribution. (*Id.*) Dr. Shramowiat assessed Claimant with right lumbar radiculopathy, low back pain, and myalgia paresthetica of the right lower extremity. (*Id.*) Claimant was instructed to continue taking Vicodin, and he was prescribed Robaxin. (*Id.*)

Claimant next treated with Dr. Shramowiat on May 24, 2010. (Tr. at 275). At that visit, Dr. Shramowiat performed EMG studies on Claimant's right lower extremity due to Claimant's complaints of low back pain and right lower extremity pain and numbness. (Tr. at 267). Dr. Shramowiat observed that Claimant's right

peroneal motor conduction velocity was slowed and his right tibial and peroneal motor latency was borderline normal. (Tr. at 268). A needle EMG of Claimant's right lower extremity was normal. (*Id.*) Dr. Shramowiat ultimately assessed Claimant with right tibial and peroneal neuropathy. (Tr. at 268, 275). Claimant was prescribed Trazodone, Vicodin, and Robaxin. (Tr. at 275).

Claimant returned to the Emergency Department at Camden-Clark Memorial Hospital on July 18, 2010 with complaints of chronic back pain, which Claimant stated had increased in the low back radiating down to his right leg. (Tr. at 250). Claimant also reported weakness and numbness in both legs. (Tr. at 256). Claimant informed Jessica Owens, NP, that he was under the care of Dr. Shramowiat receiving pain medication; however, he had been to the Emergency Department three months prior to this visit and received a steroid injection along with oral steroids that provided him some relief. (Tr. at 250). Claimant requested that treatment again. (*Id.*) Upon examination, Nurse Owens observed that Claimant's back was normal. (*Id.*) Nurse Owens also noted that Claimant was not experiencing any vertebral or costovertebral angle tenderness. (*Id.*) Claimant had a slightly weaker leg raising test on the right, and he experienced pain at approximately 15 degrees on the right; otherwise, Claimant's pulse, motor, and sensation were intact. (*Id.*) Nurse Owens observed that Claimant had mobility of his extremities and no edema. (*Id.*) Claimant was diagnosed with sciatica and given a Depo-Medrol injection, which he reported decreased his pain, and a Medrol Dosepak. (Tr. at 250-52). He was also provided with a referral to a primary care provider and a neurosurgeon. (Tr. at 250). Claimant was discharged in stable condition. (Tr. at 252, 256).

The next day, Claimant returned to Dr. Shramowiat and reported ongoing back

pain as well as some pain in his lower extremities. (Tr. at 274). Dr. Shramowiat recorded that Claimant had received a cortisone shot in the back and a Medrol Dosepak at the emergency department the night before his appointment and that he continued to take Trazodone, Vicodin, and Robaxin. (*Id.*) Dr. Shramowiat observed that Claimant's bilateral lower extremity strength was 5/5 and that his sensation was grossly intact and symmetrical to light touch. (*Id.*) He also noted that straight leg raising tests produced hamstring tightness and that Claimant had moderate to severe muscle tightness in the lumbar paravertebral region. (*Id.*) Dr. Shramowiat further indicated that Claimant experienced pain with palpation and with lumbar range of motion. (*Id.*) Claimant was assessed with lumbar strain, low back pain, and lumbar radiculopathy. (*Id.*) Claimant's Vicodin dosage was increased from Vicodin 5 mg to Vicodin ES. (*Id.*)

On July 21, 2010, Claimant visited Seyed A. Ghodsi, M.D., and Hiatt Taylor, PA-C, for a neurosurgery consultation. (Tr. at 262). Claimant reported lumbar spine pain that radiated into the right leg posteriorly down to the calf. (*Id.*) He described the pain as aching, sharp, and shooting, and he rated the pain as a six on a ten-point pain scale. (*Id.*) At its worst, Claimant indicated the pain was a nine out of ten. (*Id.*) Claimant also reported numbness and tingling in his right foot. (*Id.*) Claimant further indicated that his symptoms were constant and that his pain was aggravated by driving. (*Id.*) Claimant's treaters indicated that April 5, 2010 x-rays of his lumbar spine revealed osteophytes at L5, but they were otherwise normal. (*Id.*) Dr. Ghodsi and Physician Assistant Taylor noted that Claimant admitted experiencing muscular weakness and incoordination. (*Id.*) Otherwise, a review of systems was unremarkable. (*Id.*) Upon physical examination, Claimant's musculoskeletal system,

including his cervical spine, thoracic spine, and lumbosacral spine, was normal. (Tr. at 264-65). Claimant's extremity strength was 5/5, and his reflexes were 2+. (Tr. at 265). Dr. Ghodsi and Physician Assistant Taylor observed that Claimant had light touch sensation reduction in his right L4-L5 distribution. (*Id.*) They further observed that Claimant had a normal gait and was able to stand without difficulty. (*Id.*) Claimant was assessed with low back pain. (*Id.*) In order to more fully diagnosis Claimant's condition, Dr. Ghodsi and Physician Assistant Taylor ordered an MRI of Claimant's lumbar spine and stated that they planned to obtain Claimant's EMG records from Dr. Shramowiat. (Tr. at 266).

Claimant returned to Dr. Shramowiat on August 30, 2010. (Tr. at 273). At that time, Claimant reported that he had been without Vicodin and Robaxin for one week after losing those medications. (Tr. at 273). Claimant complained of increased low back pain and some decreased sensation in the right lateral thigh. (*Id.*) He also reported a locking sensation in the knee with any over exertion. (*Id.*) Dr. Shramowiat recorded that Claimant's last MRI showed a small disc protrusion at L5-S1. (*Id.*) Upon physical examination, Dr. Shramowiat observed that Claimant had some lumbar paravertebral tenderness along with lumbar paraspinal tightness and tenderness. (*Id.*) Claimant possessed lower extremity strength of 5/5. (*Id.*) A straight leg raise test was positive on Claimant's right leg and negative on Claimant's left leg. (*Id.*) Dr. Shramowiat recorded that Claimant had decreased sensation on his anterior lateral right thigh. (*Id.*) He assessed Claimant with low back pain and lumbar radiculopathy. (*Id.*) Claimant requested and received two lumbar paravertebral trigger point injections. (*Id.*) Dr. Shramowiat instructed Claimant to continue taking Vicodin ES four times each day and Robaxin. (*Id.*)

Claimant next visited Dr. Shramowiat on October 25, 2010. (Tr. at 272). Dr. Shramowiat recorded that Claimant had changed occupations from truck driver to barber and that he had shown some improvement since the change. (*Id.*) Dr. Shramowiat observed that Claimant's new occupation placed less stress on his back and that Claimant demonstrated more back flexibility at that appointment. (*Id.*) Claimant continued to report diminished sensation in his right lateral thigh. (*Id.*) Dr. Shramowiat's physical examination of Claimant revealed minimal lumbar paravertebral tenderness and some lumbar paraspinal muscular tenderness, predominantly on the right lumbar paraspinal region. (*Id.*) Claimant's lower extremity strength remained at 5/5. (*Id.*) A straight leg raise test was positive on Claimant's right leg and negative on Claimant's left leg. (*Id.*) Dr. Shramowiat recorded that Claimant had diminished sensation on the right lateral outer thigh. (*Id.*) Claimant was again assessed with low back pain and lumbar radiculopathy. (*Id.*) He was instructed to continue taking Vicodin ES and Robaxin. (*Id.*)

Claimant next treated with by Dr. Shramowiat on December 22, 2010. (Tr. at 271). Claimant continued to complain of low back pain, and he also reported numbness in his right lower extremity and right foot. (*Id.*) Dr. Shramowiat recorded that Claimant had disc herniation at L5-S1. (*Id.*) Upon physical examination, Dr. Shramowiat observed that Claimant's lower extremity strength was 5/5. (*Id.*) Dr. Shramowiat further recorded that Claimant had diminished light touch sensation in the right L5 nerve root distribution. (*Id.*) A straight leg raise test was positive on Claimant's right leg. (*Id.*) Dr. Shramowiat noted that Claimant had moderate to severe muscle tightness in the lumbar paravertebral region and numerous palpable tender points. (*Id.*) Claimant was assessed with right lumber radiculopathy, low back

pain, and pain in limb. (*Id.*) He was instructed to continue taking Vicodin ES and Robaxin. (*Id.*)

Claimant returned to Dr. Shramowiat on February 21, 2011 for continued treatment of low back pain as well as numbness and pain in his right lower extremity. (Tr. at 270). Claimant reported that he had to stand on his feet most of the day and that this increased his low back pain. (*Id.*) Dr. Shramowiat's physical examination of Claimant revealed moderate to severe muscle tightness in the lumbar paravertebral region, pain with lumbar extension, and numerous palpable tender points and trigger points in the lower lumbar region. (*Id.*) Dr. Shramowiat also recorded that Claimant had some paresthesias in the right lateral femoral cutaneous nerve root distribution. (*Id.*) A straight leg raise test was positive on Claimant's right leg. (*Id.*) Claimant's diagnosis and treatment plan remained unchanged. (*Id.*)

On April 18, 2011, Claimant reported to Dr. Shramowiat that in addition to complaints of low back and right leg pain, he had developed some pain down his left leg. (Tr. at 269). Claimant reported that he was prevented from prolonged standing as standing exacerbated his pain. (*Id.*) He further indicated that he was no longer working. (*Id.*) Dr. Shramowiat's physical examination of Claimant revealed that Claimant had lower extremity strength of 5/5. (*Id.*) Claimant was observed to have diminished light touch sensation in the right lateral femoral cutaneous nerve distribution and the right L5 nerve root distribution. (*Id.*) Dr. Shramowiat noted that Claimant had numerous palpable tender points and trigger points in the lower lumbar region. (*Id.*) He further indicated that Claimant had pain with lumbar flexion and extension. (*Id.*) A straight leg raising test was weakly positive on Claimant's right leg. (*Id.*) Dr. Shramowiat assessed Claimant with right lumbar radiculopathy L5, low

back pain, pain in limb, and right meralgia paresthetica. (*Id.*) Claimant was instructed to continue taking Vicodin ES and Robaxin. (*Id.*)

Claimant returned to Dr. Shramowiat on July 12, 2011 with reports of continued pain in his back and right leg. (Tr. at 282). Claimant reported that he had applied for disability and was feeling depressed. (*Id.*) Upon physical examination, Dr. Shramowiat observed that Claimant had bilateral lower extremity strength of 5/5. (*Id.*) Dr. Shramowiat recorded that Claimant's sensation was grossly intact. (*Id.*) A straight leg raising test was weakly positive on Claimant's right leg. (*Id.*) Dr. Shramowiat indicated that Claimant had some moderate muscle tightness in the lumbar paravertebral region bilaterally. (*Id.*) He further noted that Claimant had numerous palpable tender points and trigger points. (*Id.*) Dr. Shramowiat assessed Claimant with right L5 radiculopathy, low back pain, pain in limb, and endogenous depression. (*Id.*) Claimant was prescribed citalopram and instructed to continue taking Vicodin ES and Robaxin. (*Id.*)

Claimant next visited Dr. Shramowiat on September 12, 2011. (Tr. at 294). He reported that he continued to experience pain in his back and right lower extremity. (*Id.*) Claimant also indicated that his depression had improved. (*Id.*) Upon physical examination, Dr. Shramowiat observed that Claimant had bilateral lower extremity strength of 5/5. (*Id.*) A straight leg raising test was weakly positive on Claimant's right leg. (*Id.*) Dr. Shramowiat indicated that Claimant had numerous tender points and trigger points in the lower lumbar region. (*Id.*) Claimant's diagnosis and treatment plan remained unchanged. (*Id.*)

Claimant presented to Camden-Clark Medical Center on December 28, 2011, with complaints of coughing up blood. (Tr. at 288). He reported that he had been

coughing for a few days and had a history of chronic back pain from "bone spurs in [his] back." (*Id.*) Claimant was assessed with hemoptysis and hypertensive urgency. (Tr. at 289). He was later transported to Charleston Area Medical Center. (*Id.*) Upon arrival there, Claimant reported that he awoke with a gurgling sound to his breathing and that he began to cough up blood. (Tr. at 285). A physical examination and review of systems was unremarkable with the exception of Claimant's current complaint. (*Id.*) Claimant was assessed with hemoptysis, hypertension, and a history of chronic back pain. (Tr. at 286). A chest x-ray revealed no radiographic evidence of acute cardiopulmonary disease. (Tr. at 286-87).

On March 5, 2012, Claimant returned to Dr. Shramowiat complaining of continued low back and right lower extremity pain. (Tr. at 293). Dr. Shramowiat's examination of Claimant revealed bilateral lower extremity strength of 5/5 with sensation intact. (*Id.*) A straight leg raising test produced hamstring tightness with a weak positive on Claimant's right leg. (*Id.*) Dr. Shramowiat also observed moderate muscle tightness in the lumbar paravertebral region bilaterally. (*Id.*) Claimant was assessed with right lumbar radiculopathy, low back pain, pain in limb, and endogenous depression. (*Id.*) Dr. Shramowiat instructed Claimant to continue taking Vicodin ES, Robaxin, citalopram, and Verapamil. (*Id.*) It was also recommended that Claimant begin taking hydrochlorothiazide. (*Id.*)

Claimant next treated with Dr. Shramowiat on April 30, 2012. (Tr. at 292). Dr. Shramowiat noted that Claimant experienced chronic low back pain, which radiated down his right lower extremity and caused some numbness on his lateral thigh. (Tr. at 292). He further noted that Claimant had been taking Celexa for his depression and that it seemed to be working. (*Id.*) Dr. Shramowiat's physical examination of

Claimant revealed that he had lumbar paravertebral tenderness. (*Id.*) Dr. Shramowiat also observed that Claimant had moderate tightness in the lumbar paraspinal muscles, which were tender. (*Id.*) Claimant's lower extremity strength was 5/5, and straight leg raising tests were negative. (*Id.*) Dr. Shramowiat indicated that sensation was intact. (*Id.*) Claimant was assessed with lumbar radiculopathy L5, low back pain, pain in limb, and depression. (*Id.*) Dr. Shramowiat recommended that Claimant continue to take Vicodin ES, Robaxin, Celexa, and hydrochlorothiazide. (*Id.*) Dr. Shramowiat also increased Claimant's Verapamil dosage. (*Id.*)

On July 3, 2012, Claimant returned to Dr. Shramowiat and continued to report low back and right lower leg pain. (Tr. at 291). However, Claimant reported that he had been doing fairly well with his medication. (*Id.*) Dr. Shramowiat's physical examination of Claimant revealed that Claimant had lower extremity strength of 5/5. (*Id.*) Dr. Shramowiat observed some mild paresthesias in Claimant's right L5 nerve root distribution. (*Id.*) A straight leg raising test was weakly positive on Claimant's right leg. (*Id.*) Dr. Shramowiat also observed moderate muscle tightness in Claimant's lumbar paravertebral region bilaterally. (*Id.*) Claimant was diagnosed with right L5 radiculopathy, low back pain, and pain in limb. (*Id.*) His treatment plan remained the same. (*Id.*)

Claimant again visited Dr. Shramowiat on August 30, 2012. (Tr. at 300). He reported constant low back pain and intermittent pain and numbness in his posterior lateral right lower extremity. (*Id.*) Claimant indicated that his medications had decreased his pain to an acceptable level. (*Id.*) He further indicated that Celexa had improved his mood and decreased his stress. (*Id.*) Upon physical examination, Dr. Shramowiat observed that Claimant's gait was grossly normal and that his bilateral

lower extremity strength was 5/5. (*Id.*) Dr. Shramowiat also noted that Claimant's sensation was grossly intact. (*Id.*) He did indicate, however, that Claimant experienced diminished sensation at L5 distribution to right lower extremity. (*Id.*) Straight leg raising tests were negative bilaterally. (*Id.*) Dr. Shramowiat recorded that Claimant had moderate lower lumbar paraspinal tightness. (*Id.*) He diagnosed Claimant with lumbar radiculopathy and low back pain. (*Id.*) Claimant was instructed to continue taking his medications and use ice as needed. (*Id.*) Dr. Shramowiat also instructed Claimant to establish care with a primary care physician as soon as possible. (*Id.*)

### B. Evaluations and Opinions

On May 12, 2011, Mr. Daniel Scott, SDM, completed a Physical RFC Assessment regarding Claimant's functional limitations. (Tr. at 212-19). Mr. Scott recorded that Claimant's primary diagnosis was lumbar radiculopathy and his secondary diagnosis was low back pain. (*Id.* at 212). The RFC Assessment was completed for both a current evaluation and for Claimant's date last insured, which was September 30, 2010. (*Id.*) As to exertional limitations, Mr. Scott found that Claimant could occasionally and frequently lift ten pounds, stand and/or walk for about six hours in an eight-hour workday, and sit for about six hours in an eight-hour workday. (Tr. at 213). Mr. Scott also opined that Claimant had unlimited ability to push and pull. (*Id.*) As to postural limitations, Claimant could occasionally climb ramps and stairs, balance, stoop, kneel, and crouch. (Tr. at 214). However, Claimant could never crawl or climb ladders, rope, or scaffolds. (*Id.*) As for manipulative, visual, and communicative limitations, Mr. Scott found that none were established. (Tr. at 215-16). With regard to environmental limitations, Mr. Scott found that

Claimant should avoid concentrated exposure to extreme cold, extreme heat, wetness, humidity, noise, vibration, fumes, odors, dusts, gases, poor ventilation, and hazards. (Tr. at 216). Mr. Scott ultimately found that Claimant's allegations and limitations were supported by the medical evidence in the file. (Tr. at 217). Mr. Scott noted that Claimant alleged a back injury, leg numbness, and nerve damage. (Tr. at 219). He also observed that Claimant reported dressing slowly and having difficulty sitting on the toilet due to numbness in his legs. (*Id.*) Mr. Scott further indicated that Claimant's activities included cooking, inside housework, driving, handling money, watching television, and spending time with his girlfriend and his children. (*Id.*) Mr. Scott recognized that Claimant indicated he was limited in most physical activities. (*Id.*) In support of the RFC Assessment, Mr. Scott specifically cited medical records from April 2010, May 2010, July 2010, February 2011, and April 2011. (*Id.*)

That same day, Mr. Scott completed a Report of Contact form regarding vocational analysis. (Tr. at 220). Mr. Scott recorded on that form that Claimant's Physical RFC Assessment limited him to sedentary work with some postural limitations. (*Id.*) He noted that a mental assessment was not completed. (*Id.*) Mr. Scott observed that Claimant had no previous transferable job skills and that he could not perform his past work as a truck driver at the medium exertional level. (*Id.*) However, Mr. Scott concluded that Claimant could perform other work, including jobs as an addresser, ampoule sealer, and brimer. (*Id.*)

On June 13, 2011, Dr. Franyutti completed a case analysis. (Tr. 280). He stated that he had reviewed all of the medical evidence in the case file and affirmed Mr. Scott's Physical RFC Assessment as written. (Tr. at 280). On June 15, 2011, Michele Zimmerman completed a Report of Contact form stating that she agreed with the

initial vocational analysis. (Tr. at 229). She opined that Claimant was not able to perform his past work, but that he would be capable of performing other work. (*Id.*)

On October 2, 2012, Dr. Shramowiat completed a form titled "Medical Assessment of Ability to do Work-Related Activities (Physical)." (Tr. at 328). Dr. Shramowiat opined that Claimant could lift and/or carry a total of twenty pounds. (*Id.*) He further opined that Claimant could occasionally lift and/or carry twenty pounds and frequently lift and/or carry ten pounds. (*Id.*) In support of this opinion, Dr. Shramowiat cited an MRI of Claimant's lumbar spine taken in 2004 that revealed a small focal disc protrusion at L5-S1 and an EMG performed in 2010 that showed right tibial and peroneal neuropathy. (*Id.*) Dr. Shramowiat further concluded that Claimant could stand and/or walk for a total of three hours in an eight-hour workday and fifteen minutes without interruption. (*Id.*) His conclusion was based upon Claimant's reports of constant back pain as well as intermittent pain and numbness in the posterior lateral right lower extremity. (*Id.*) Dr. Shramowiat also opined that Claimant could sit for a total of four hours in an eight-hour workday with the ability to sit for thirty minutes without interruption. (Tr. at 329). He also noted that Claimant would require frequent position changes. (*Id.*) Dr. Shramowiat based this opinion on Claimant's complaints and his diminished sensation at the L5 distribution. (*Id.*) In relation to postural limitations, Dr. Shramowiat opined that Claimant could occasionally climb stairs, balance, stoop, crouch, and kneel, but he should never crawl. (*Id.*) Dr. Shramowiat asserted that these limitations were based on "MRI and EMG findings." (*Id.*) As for environmental restrictions, Dr. Shramowiat determined that Claimant should have both height and vibration restrictions due to his leg numbness and the possibility of increased back pain. (Tr. at 329-30). In regard

to manipulative limitations, Dr. Shramowiat opined that Claimant was limited in his abilities to reach in all directions, to handle (gross manipulation), to finger (fine manipulation), and to feel. (Tr. at 330). Dr. Shramowiat concluded that Claimant could perform reaching, handling, fingering, and feeling frequently. (*Id.*) He based his opinion on Claimant's carpal tunnel syndrome, which was identified in a January 2005 EMG report. (*Id.*) Finally, Dr. Shramowiat found that Claimant had no visual and communicative limitations. (Tr. at 331).

**VI.   <u>Standard of Review</u>**

The issue before the Court is whether the final decision of the Commissioner is based upon an appropriate application of the law and is supported by substantial evidence. *See Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). In *Blalock v. Richardson*, the Fourth Circuit Court of Appeals defined "substantial evidence" to be:

> [E]vidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

*Blalock*, 483 F.2d at 776 (quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966)). This Court is not charged with conducting a *de novo* review of the evidence. Instead, the Court's function is to scrutinize the record and determine whether it is adequate to support the conclusion of the Commissioner. *Hays*, 907 F.2d at 1456. When conducting this review, the Court does not re-weigh evidence, make credibility determinations, or substitute its judgment for that of the Commissioner. *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 2001) (citing *Hays*, 907 F.2d at 1456). Moreover, "[t]he fact that the record as a whole might support an inconsistent conclusion is immaterial, for the language of § 205(g) ... requires that the court uphold the

[Commissioner's] decision even should the court disagree with such decision as long as it is supported by 'substantial evidence.'" *Blalock*, 483 F.2d at 775 (citations omitted). Thus, the relevant question for the Court is "not whether the claimant is disabled, but whether the ALJ's finding of no disability is supported by substantial evidence." *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (citing *Craig*, 76 F.3d at 589).

## VII.   Discussion

### The ALJ's Consideration of Dr. Shramowiat's Opinion

Claimant contends that the ALJ incorrectly assigned greater weight to Dr. Franyutti's opinion than was assigned to Dr. Shramowiat's opinion. (ECF No. 12 at 6). Specifically, Claimant insists that the ALJ erred by disregarding the portion of Dr. Shramowiat's Medical Assessment opinion that limited Claimant's ability to sit to a total of four hours in an eight-hour workday. (*Id.* at 8). If the ALJ had not rejected Dr. Shramowiat's opinion as to this limitation, Claimant maintains that he would have been found disabled as he would be unable to work eight-hour days, five days per week. (ECF No. 14 at 4). Claimant argues that the ALJ inappropriately focused on a few notations in the records from his recent treatment with Dr. Shramowiat in rejecting his treating physician's opinion. (ECF No. 12 at 8-9). He asserts that the ALJ "cherry-pick[ed]" these records to undermine Dr. Shramowiat's opinion. (ECF No. 14 at 3). Furthermore, Claimant avers that the ALJ's weighing of opinion evidence was contradictory as he assigned no weight to Mr. Scott's Assessment, but significant weight to Dr. Franyutti's opinion affirming Mr. Scott's Assessment. (ECF No. 12 at 9-10). Ultimately, Claimant believes that the ALJ's did not adequately explain his rationale for assigning more weight to non-examining physician's opinion than was

assigned to Claimant's treating physician's opinion. (*Id.* at 8-10).

When evaluating a claimant's application for disability benefits, the ALJ "will always consider the medical opinions in [the] case record together with the rest of the relevant evidence [he] receives." 20 C.F.R. §§ 404.1527(b), 416.927(b). Medical opinions are defined as "statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of [a claimant's] impairment(s), including [his] symptoms, diagnosis and prognosis, what [he] can still do despite [his] impairment(s), and [his] physical or mental restrictions." *Id.* §§ 404.1527(a)(2), 416.927(a)(2). Title 20 C.F.R. § 404.1527(c) and 20 C.F.R. § 416.927(c) outline how the opinions of accepted medical sources will be weighed in determining whether a claimant qualifies for disability benefits. In general, an ALJ should give more weight to the opinion of an examining medical source than to the opinion of a non-examining source. *Id.* §§ 404.1527(c)(1), 416.927(c)(1). Even greater weight should be allocated to the opinion of a treating physician, because that physician is usually most able to provide "a detailed, longitudinal picture" of a claimant's alleged disability. *Id.* §§ 404.1527(c)(2), 416.927(c)(2). Indeed, a treating physician's opinion should be given ***controlling*** weight when the opinion is supported by clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence. *Id.* If the ALJ determines that a treating physician's opinion is not entitled to controlling weight, the ALJ must then analyze and weigh all the medical opinions of record, taking into account certain factors[1] listed in 20 C.F.R. § 404.1527(c)(2)-(6) and 20 C.F.R. §

---

[1] The factors include: (1) length of the treatment relationship and frequency of evaluation, (2) nature and extent of the treatment relationship, (3) supportability, (4) consistency, (5) specialization, and (6) other factors bearing on the weight of the opinion.

416.927(c)(2)-(6), and must explain the reasons for the weight given to the opinions. "Adjudicators must remember that a finding that a treating source medical opinion is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with other substantial evidence in the case record means only that the opinion is not entitled to 'controlling weight,' not that the opinion should be rejected ... In many cases, a treating source's opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight." Social Security Ruling ("SSR") 96-2p, 1996 WL 374188, at *4. Nevertheless, a treating physician's opinion may be rejected in whole or in part when there is persuasive contrary evidence in the record. *Coffman v. Bowen,* 829 F.2d 514, 517 (4th Cir. 1987). Ultimately, it is the responsibility of the ALJ, not the court, to evaluate the case, make findings of fact, weigh opinions, and resolve conflicts of evidence. *Hays*, 907 F.2d at 1456.

Medical source statements on issues reserved to the Commissioner, however, are treated differently than other medical source opinions. SSR 96-5p, 1996 WL 374183 (S.S.A. 1996). In both the regulations and SSR 96-5p, the SSA explains that "some issues are not medical issues regarding the nature and severity of an individual's impairment(s) but are administrative findings that are dispositive of a case; i.e., that would direct the determination or decision of disability;" including the following:

> 1. Whether an individual's impairment(s) meets or is equivalent in severity to the requirements of any impairment(s) in the listings;
>
> 2. What an individual's RFC is;
>
> 3. Whether an individual's RFC prevents him or her from doing past relevant work;

4. How the vocational factors of age, education, and work experience apply; and

5. Whether an individual is "disabled" under the Act.

*Id.* at *2.   "The regulations provide that the final responsibility for deciding issues such as these is reserved to the Commissioner." *Id.* As such, a medical source statement on an issue reserved to the Commissioner is never entitled to controlling weight or special significance, because "giving controlling weight to such opinions would, in effect, confer upon the [medical] source the authority to make the determination or decision about whether an individual is under a disability, and thus would be an abdication of the Commissioner's statutory responsibility to determine when an individual is disabled." *Id.* at *2. Still, these opinions must always be carefully considered, "must never be ignored," and should be assessed for their supportability and consistency with the record as a whole. *Id.* at *3.

As Claimant points out, the ALJ did not supply details in his written decision regarding how he applied the factors in 20 C.F.R. § 404.1527(c) and 20 C.F.R. § 416.927(c) to determine the weight given to Dr. Shramowiat's opinion. Instead, the ALJ summarized Claimant's treatment with Dr. Shramowiat, as well as Dr. Shramowiat's opinions contained in the Medical Assessment form and concluded that Dr. Shramowiat's opinion was "rejected to the extent that it indicated the claimant can only sit for a total of four hours during an eight-hour workday." (Tr. at 18-20). While the ALJ did find that Dr. Shramowiat's opinion was "supported by the evidence of large in part," the ALJ nevertheless rejected the sitting limitation portion of Dr. Shramowiat's opinion because a "thorough review of the record reveal[ed] no objective findings or clinical treatment records that support such a limitation." (Tr. at

20). The ALJ further observed that Claimant's most recent treatment records reflected that his symptoms of pain were well controlled with medication and that his physical limitations had improved. (*Id.*) In addition, the ALJ rejected Dr. Shramowiat's opinion as to Claimant's manipulative limitations as he found that the record demonstrated only that Claimant had a history of carpal tunnel syndrome, but it did not contain any findings regarding any resultant carpal tunnel syndrome symptoms since the alleged disability onset date. (*Id.*) Claimant insists that a more substantial analysis of Dr. Shramowiat's opinion was required under SSR 96-2p. (ECF No. 12 at 8-9).

However, the undersigned does not find that the ALJ's rationale is so deficient that it requires remand of the Commissioner's decision. Although 20 C.F.R. § 404.1527(c) and 20 C.F.R. § 416.927(c) provide that in the absence of a controlling opinion by a treating physician, all of the medical opinions must be evaluated and weighed based upon various factors, the regulations do not explicitly require the ALJ to recount the details of that analysis in the written opinion. Instead, the regulations mandate only that the ALJ give "good reasons" in the decision for the weight ultimately allocated to medical source opinions. *Id.* §§ 404.1527(c)(2), 416.927(c)(2). SSR 96-2p provides additional clarification of the ALJ's responsibility to give good reasons, stating:

> When the determination or decision: is not fully favorable, e.g., is a denial ... the notice of determination or decision must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight.

Cases discussing this duty take different approaches on what and how much the ALJ

must include in the written opinion to constitute an adequate explanation. Some courts require the ALJ to "comprehensively set forth reasons for the weight assigned to a treating physician's opinion." *Newbury v. Astrue,* 321 Fed. App'x 16, 17 (2nd Cir. 2000) (quoting *Halloran v. Barnhart,* 362 F.3d 28, 33 (2nd Cir. 2004)); *see also Sharfarz v. Bowen,* 825 F.2d 278, 279 (11th Cir. 1987). Other courts only insist on a detailed analysis of the weight given to a treating physician's opinion under the factors when there is an absence of "reliable medical evidence from a treating or examining physician controverting the claimant's treating specialist." *Rollins v. Astrue,* 464 Fed. App'x. 353, 358 (5th Cir. 2012) (quoting *Newton v. Apfel*, 209 F.3d 448, 453 (5th Cir. 2000)). Finally, some courts take the position that while the ALJ must consider the factors, he is not required to discuss each one in his opinion as long as a subsequent reviewer is able to understand the weight given to the opinions and the reasons for that weight. *Oldham v. Astrue,* 509 F.3d 1254, 1258 (10th Cir. 2007); *see also Green v. Astrue,* 588 F. Supp. 2d 147, 155 (D. Mass. 2008). "Simply stated, the adequacy of the written discussion is measured by its clarity to subsequent reviewers." *Young v. Colvin*, No. 3:13-cv-20719, 2014 WL 4546958, at *13 (S.D.W.Va. Sept. 12, 2014); *Tucker v. Astrue*, 897 F. Supp. 2d 448, 468 (S.D.W.Va. 2012); *see also Jividen v. Colvin*, No. 3:12-04698, 2014 WL 1333196, at *1, *21 (S.D.W.Va. Mar. 31, 2014) (adopting PF&R wherein magistrate judge recognized that ALJ need not explicitly mention each factor contained in 20 C.F.R. § 404.1527(c) when evaluating treating physician's opinion). This court has recently held "while the ALJ also has a duty to 'consider' each of the ... factors listed above, that does not mean that the ALJ has a duty to discuss them when giving 'good reasons.' Stated differently, the regulations require the ALJ to consider the ... factors, but do not demand that the

ALJ explicitly discuss each of the factors." *Hardy v. Colvin,* No. 2:13–cv–20749, 2014 WL 4929464, at *2 (S.D.W.Va. Sept. 30, 2014).

The ALJ began his RFC discussion by recognizing that certain rules and regulations control the weighing of medical opinion evidence, including 20 C.F.R. § 404.1527, 20 C.F.R. § 416.927, and "SSRs 96-2p, 96-5p, 96-6p and 06-3p." (Tr. at 17). Next, the ALJ summarized Claimant's allegations, including those contained in his adult function report and those made at the administrative hearing. (*Id.*) The ALJ then utilized the two-step process for evaluating a claimant's allegations regarding his symptoms and found that Claimant's medically determinable impairments could reasonably be expected to cause his alleged symptoms, but not to the degree of severity that Claimant described. (Tr. at 17-18); *see also* 20 C.F.R. §§ 404.1529, 416.929. After finding that Claimant was only partially credible, the ALJ thoroughly summarized Claimant's treatment records, including medical records related to his treatment with Dr. Shramowiat from April 2010 through August 2012. (Tr. at 18-19). The ALJ pointed out that Claimant repeatedly reported low back pain at his appointments with Dr. Shramowiat throughout 2010, but that Dr. Shramowiat consistently recommended conservative treatment measures, including pain medication and trigger point injections. (Tr. at 18-19). The ALJ also stressed that Claimant was encouraged to increase his activities, including walking. (Tr. at 19). The ALJ further noted that an MRI of Claimant's lumbar spine from 2004 showed a small focal disc protrusion at L5-S1, but that this protrusion did not cause any significant central narrowing or neural foraminal narrowing. (Tr. at 18). In addition, the ALJ observed that x-rays of Claimant's spine revealed mild arthritic changes and early findings of degenerative disc disease at L5-S1. (*Id.*)

The ALJ then turned to Claimant's neurological consultation with Dr. Ghodsi in July 2010. (*Id.*) He noted that "Dr. Ghodsi's examination failed to reveal the type of significant clinical abnormalities one would expect for a disabled individual." (*Id.*) In support of this observation, the ALJ pointed out that Claimant appeared to be in no acute distress at that appointment and that Claimant did not experience any tenderness to palpation of his back. (*Id.*) Moreover, the ALJ recognized that Claimant had full range of motion at the lumbosacral junction, his straight leg tests were negative, his bilateral extremity strength was normal, his motor test was normal, his gait was normal, and his reflexes were normal. (*Id.*)

The ALJ reviewed Claimant's treatment with Dr. Shramowiat throughout 2011. (Tr. at 19). The ALJ observed that Claimant continued to complain of low back pain to Dr. Shramowiat and that he presented with diminished sensation to light touch and parenthesis. (*Id.*) The ALJ also noted that Dr. Shramowiat recorded weakly positive straight leg raising tests, muscle tightness, tenderness, and pain with extension while examining Claimant throughout 2011. (*Id.*)

The ALJ summarized Claimant's treatment with Dr. Shramowiat for 2012. (*Id.*) He found that the treatment records contained physical findings similar to those in previous treatment records. (*Id.*) However, the ALJ highlighted Dr. Shramowiat's notation in a July 2012 record stating that Claimant had been doing fairly well on his medications. (*Id.*) The ALJ also specifically cited an August 2012 treatment record wherein Dr. Shramowiat documented Claimant's report that his medications decreased his pain to an acceptable level. (*Id.*) The ALJ further commented that, at the August 2012 visit, Claimant's gait was normal, his bilateral lower extremity strength was 5/5, his sensation was intact, and his straight leg raising tests were

negative bilaterally. (*Id.*)

After discussing Claimant's treatment records, the ALJ turned to the opinion evidence in the record. (*Id.*) He reviewed the Physical RFC Assessment supplied by Mr. Scott, and then found that Mr. Scott's opinion was entitled to no weight as Mr. Scott was not an acceptable medical source, but rather an SDM. (*Id.*) Nonetheless, the ALJ recognized that an acceptable medical source, Dr. Franyutti, submitted a case analysis affirming Mr. Scott's RFC Assessment. (*Id.*) The ALJ assigned significant weight to Dr. Franyutti's opinion as it was consistent with the record as a whole. (*Id.*) In analyzing Dr. Franyutti's opinion, the ALJ specifically noted that Claimant's symptoms had been conservatively treated and that this conservative treatment was relatively effective in controlling his pain symptoms." (*Id.*) However, the ALJ indicated that when considering the evidence in the light most favorable to the Claimant, he found Claimant to be "more functionally limited" than reflected in Dr. Franyutti's opinions. Therefore, the ALJ included greater restrictions in the RFC determination than were called for by Dr. Franyutti's statement. (Tr. at 17, 19).

Finally, the ALJ examined Dr. Shramowiat's opinions contained in the Medical Assessment form that he completed. (Tr. at 19-20). As discussed above, the ALJ found that Dr. Shramowiat's opinion regarding Claimant's sitting limitation was not supported by any objective findings or clinical treatment records. (Tr. at 20). The ALJ again pointed out that recent treatment records demonstrated that Claimant's pain was "well controlled" with medication and that recent physical examinations also suggested that Claimant's physical limitations had improved. (*Id.*) It is sufficiently clear that when the ALJ found Dr. Shramowiat's opinion to be without support from the objective evidence in the record, the ALJ was referring to the medical evidence

that he had just reviewed in detail. (Tr. at 18-20). In addition, the undersigned can infer from the explanation provided by the ALJ that he used the appropriate factors in weighing Dr. Shramowiat's opinion. The ALJ recognized that Dr. Shramowiat was Claimant's treating physician since 2010, and that Claimant had visited him regularly.[2] (Tr. at 18). The ALJ also examined the consistency and supportability of Dr. Shramowiat's opinion as demonstrated by his review of Dr. Franyutti's opinion and Claimant's treatment records, including Claimant's most recent treatment records that the ALJ found to be inconsistent with Dr. Shramowiat's opinion. (Tr. at 19-20). In the end, the ALJ determined that Dr. Shramowiat's opinion as to the four-hour sitting limitation was unsupported by the objective medical evidence and inconsistent with his own treatment records. (Tr. at 20). Applying the sufficient clarity standard described above, the undersigned finds that the ALJ adequately explained his reasons for rejecting that portion of Dr. Shramowiat's opinion. Ultimately, the RFC assessment was based upon a thorough review, analysis, and weighing of the medical information, opinions, and other evidence in the record, and constituted ALJ's conclusion on an issue reserved to the Commissioner. Accordingly, the undersigned **FINDS** that the ALJ complied with Social Security regulations and rulings in the manner in which he arrived at Claimant's RFC findings.

The undersigned also **FINDS** that the ALJ's rejection of Dr. Shramowiat's opinion limiting Claimant to four hours of sitting in an eight-hour workday is supported by substantial evidence. As the ALJ pointed out, Claimant's symptoms were treated conservatively with pain medication from 2010 through 2012, and Dr.

---

[2] The record shows that Claimant treated with Dr. Shramowiat as early as 2005. (Tr. at 325). However, there is gap in treatment records between May 2006 and April 2010. (*See* Tr. at 259, 315).

Shramowiat observed in July 2012 that Claimant had been doing "fairly well" while on medication. (Tr. at 19, 301). At that same appointment, Dr. Shramowiat noted that Claimant's lower extremity strength was 5/5, but he had some mild paresthesias in his right L5 nerve root distribution, moderate muscle tightness in the lumbar paravertebral region bilaterally, and a weakly positive straight leg raise test on his right leg. (Tr. at 301). However, Dr. Shramowiat continued Claimant on his pain medication. (*Id.*) The ALJ emphasized Claimant's subsequent treatment record with Dr. Shramowiat related to an August 2012 appointment. (Tr. at 19, 300). As stated above, at that visit, Dr. Shramowiat noted that Claimant reported his medications had decreased his pain to an acceptable level. (*Id.*) Dr. Shramowiat's physical examination at that appointment revealed that Claimant's gait was normal, his bilateral lower extremity strength was 5/5, his sensation was intact, and his straight leg raise tests were negative bilaterally. (*Id.*) In weighing Dr. Shramowiat's opinion, it was certainly permissible for the ALJ to consider the conservative treatment that Claimant had routinely received and any notations in the medical record that this treatment alleviated his symptoms. *See Fisher v. Barnhart*, 181 F.App'x 359, 364-65 (4th Cir. 2006) (recognizing that a claimant may have impairments "under control such that they do not manifest themselves in any way that would limit the claimant's capacity for work"); *Wilson v. Comm'r, Soc. Sec. Admin.*, 161 F.3d 5, 1998 WL 647031, at *1 (4th Cir. Sept. 16, 1998) (unpublished table decision) (concluding that conservative treatment recommendations did not suggest that claimant's pain was disabling); *Hoke v. Chater*, 74 F.3d 1231, 1996 WL 13856, at *3 (4th Cir. Jan. 16, 1996) (unpublished table decision) (recognizing that conservative treatment with pain medication may be considered in substantial evidence analysis); *Gross v.*

*Heckler*, 785 F.2d 1163, 1166 (4th Cir. 1986) (recognizing that if a symptom can be "reasonably controlled by medication or treatment, it is not disabling"); *Law v. Colvin*, No. 1:13-01253, 2014 WL 4656120, at *1, *16 (S.D.W.Va. Sept. 16, 2014) (adopting PF&R wherein magistrate judge found ALJ's decision assigning little weight to treating physician's opinion was supported by substantial evidence when ALJ compared conservative treatment history with treating physician's opinion). Although Claimant had visited the Emergency Department twice for his back pain in 2010, as the ALJ's summary of the treatment records demonstrates, Claimant did not again visit the Emergency Department for back pain after July 2010, and he only received pain medication and injections the two times that he presented there.

While Claimant accuses the ALJ of "cherry-picking" certain records from Claimant's treatment with Dr. Shramowiat to support his findings, the ALJ was not required to discuss all of Dr. Shramowiat's treatment records; he was only required to consider them. *See Dyer v. Barnhart*, 395 F.3d 1206, 1211 (11th Cir. 2005) (explaining there "is no rigid requirement that the ALJ specifically refer to every piece of evidence in his decision"); *Craig v. Apfel*, 212 F.3d 433, 436 (8th Cir. 2000) ("[A]n ALJ is not required to discuss all the evidence submitted, and an ALJ's failure to cite specific evidence does not indicate that it was not considered."); *Aytch v. Astrue*, 686 F.Supp.2d 590, 602 (E.D.N.C. 2010) ("The ALJ is not required to discuss all evidence in the record."). More importantly, a review of the ALJ's decision demonstrates that he specifically considered Dr. Shramowiat's records from April 2010 through August 2012. (Tr. at 18-19). To the extent that the records conflicted, the ALJ was tasked with resolving any conflicts. *See Slaughter v. Barnhart*, 124 F. App'x 156, 157 (4th Cir. 2005) (recognizing that the ALJ has the duty to resolve conflicts in any evidence

37

presented, not the courts).

As the ALJ stressed, the most recent treatment records evidenced that Claimant's symptoms were adequately treated by prescription pain medication. This is not a case where an ALJ "cherry-picked" a single inconsistency out of the treatment records to discredit a treating physician's opinion. *Cf. Bryant v. Colvin*, No. 3:12-cv-0307, 2013 WL 6800127, at \*12 (N.D. Ind. Dec. 20, 2013) (recognizing that ALJ cannot "cherry-pick" one inconsistency out of treatment records to reject treating physician's opinion, but multiple inconsistencies may constitute good cause to deny treating physician's opinion controlling weight). Instead, after reviewing all of Claimant's treatment records with Dr. Shramowiat from 2010 through 2012, the ALJ appropriately relied on at least two of Claimant's recent treatment records and the overall course of treatment with Dr. Shramowiat for those two years to determine the evidentiary value that Dr. Shramowiat's opinion was entitled to. Moreover, as discussed in more detail below, the ALJ also supported his analysis with treatment records from other providers. In concluding that the objective evidence did not support a portion of Dr. Shramowiat's opinion, the ALJ also implicitly acknowledged that part of the underlying basis for Dr. Shramowiat's opinion were Claimant's complaints concerning his symptoms, which the ALJ found were not fully credible. (Tr. at 18, 20, 329).

Furthermore, other medical records specifically cited by the ALJ supported his partial rejection of Dr. Shramowiat's opinion. The ALJ recognized that a May 2010 EMG study showed that Claimant's right peroneal motor conduction was slowed and that his right tibial and peroneal motor latency was borderline normal. (Tr. at 18). The test also revealed that Claimant's right lower extremity was normal. (Tr. at 268).

Dr. Shramowiat concluded from these test results that Claimant suffered from right tibial and peroneal neuropathy. (Tr. at 18). The ALJ noted that after this EMG study was conducted, in July 2010, Dr. Ghodsi, a neurologist, examined Claimant and observed that Claimant was in no acute distress, he had full range of motion at the lumbosacral spine, and straight leg raise tests were negative. (*Id.*) Moreover, Dr. Ghodsi recorded that Claimant's bilateral lower extremity strength was normal, his gait was normal, his motor tests were normal, and his reflexes were normal. (*Id.*) The ALJ determined that Dr. Ghodsi's examination of Claimant "failed to reveal the type of significant clinical abnormalities one would expect for a disabled individual." (*Id.*) In addition, the ALJ analyzed diagnostic imaging records. (*Id.*) He reviewed an MRI from 2004 that revealed a small focal disc protrusion at L5-S1, which did not create any significant narrowing or neural foraminal narrowing. (*Id.*) The ALJ also cited April 2010 x-rays of Claimant's spine that displayed only mild arthritic changes of the vertebral bodies and early findings of degenerative disc disease at L5-S1 with no evidence of acute congenital anomaly. (*Id.*) This objective medical evidence bolstered the ALJ's partial rejection of Dr. Shramowiat's opinion.

Finally, Dr. Franyutti's opinion supported the ALJ's finding as to the value of Dr. Shramowiat's opinion. While the content of Dr. Franyutti's case analysis is admittedly brief, he did state that he reviewed all of the medical evidence in Claimant's case file before affirming Mr. Scott's Physical RFC Assessment. (Tr. at 280). Moreover, Dr. Franyutti's opinion was formed even before Claimant's treatment records explicitly noted his improvement, as Dr. Franyutti completed the case analysis on June 13, 2011. (*Id.*) In regard to Claimant's exertional limitations, Dr. Franyutti opined (by affirming Mr. Scott's Assessment) that Claimant could sit for six

hours in an eight-hour workday. (*Id.*; Tr. at 213, 280). The ALJ assigned significant weight to Dr. Franyutti's opinion given Claimant's history of conservative treatment for his symptoms and the effectiveness of that treatment in controlling his symptoms. (Tr. at 19). The ALJ also found that Dr. Franyutti's opinion was consistent with the record as a whole, (*id.*), and apparently agreed with Dr. Franyutti's opinion as to Claimant's sitting limitation.[3] The undersigned finds that this conclusion is supported by substantial evidence. To the extent that Claimant argues that the ALJ's analysis of Dr. Franyutti's opinion was contradicted by his dismissal of Mr. Scott's RFC Assessment, other federal courts have consistently rejected similar contentions. Those courts have held that an ALJ may properly allocate weight to the opinion of a medical source who affirms the Assessment of an SDM after reviewing all of the record evidence. *See, e.g.*, *Gerard v. Colvin*, No. 13-2029, 2014 WL 2095169, at *4 (D. Kan. May 20, 2014) ("[E]ven though the opinion of a SDM is worthy of no weight as a medical opinion, a medical consultant might adopt the SDM opinion as his own, and the resulting medical opinion is then properly evaluated to determine whether it might be accorded particular weight in the Commissioner's decision."); *Pelzer v. Colvin*, No. 13-1151, 2014 WL 1875163, at *3 (D. Kan. May 9, 2014) (holding that ALJ did not err by relying on medical source opinion affirming SDM's opinion); *Meadows v. Astrue*, No. 5:11cv00063, 2012 WL 3542536, at *10 (W.D.Va. Aug. 15, 2012)

---

[3] Claimant points out that Dr. Franyutti's case analysis limited him to lifting ten pounds both occasionally and frequently, and he asserts that this would permit him to perform only sedentary level work, and not light level work as the ALJ found. (Tr. at 17, 213, 280; ECF No. 14 at 4). Claimant cites this purported discrepancy in support of his argument that the ALJ's analysis of Dr. Franyutti's opinion was lacking. (ECF No. 14 at 4). However, Claimant testified at the administrative hearing that he could lift twenty to twenty-five pounds comfortably, and the ALJ specifically noted this testimony in his RFC finding. (Tr. at 17, 39). In addition, Dr. Shramowiat opined that Claimant could occasionally lift twenty pounds and frequently carry ten pounds. (Tr. at 328). Furthermore, it is permissible for an ALJ to classify a claimant as between exertional levels and determine that a claimant may perform some range of light work, but not the full range of light work. *See, e.g.*, *Golini v. Astrue*, 483 F. App'x 806, 808 (4th Cir. 2012) (recognizing that claimant's RFC may exist between exertional categories).

(report and recommendation concluding that ALJ could rely on medical source opinion affirming SDM's opinion); *Fisher v. Astrue*, No. 1:10cv073, 2011 WL 4965030, at *3 (W.D.N.C. Oct. 19, 2011) (same); *Lawrence v. Astrue*, No. C09-1368Z, 2010 WL 2990760, at *1 (W.D. Wash. July 27, 2010) (collecting cases in support of proposition); *Lamp v. Astrue*, No. 3:07-CV-130, 2009 WL 412884, at *1, *14 (N.D.W.Va. Feb. 18, 2009) (adopting report and recommendation wherein magistrate judge recognized that ALJ could rely on medical source opinion affirming SDM's opinion). In this context, there is nothing inherently contradictory in assigning no weight to a lay opinion, but significant weight to a medical source opinion containing the same limitations. As the regulations and rulings make clear, the source of an opinion is often crucial to these types of cases.

In sum, the ALJ's implicit finding that a portion of Dr. Shramowiat's opinion was not entitled to controlling weight is supported by substantial evidence. Dr. Shramowiat's opinion concerning Claimant's ability to sit is inconsistent with other substantial evidence, and there is a lack of supporting medical evidence to substantiate that part of his opinion. *See* 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). Furthermore, the ALJ's explicit finding that a portion of Dr. Shramowiat's opinion should be rejected is supported by substantial evidence, including Claimant's treatment records and Dr. Franyutti's opinion. While Dr. Franyutti never examined Claimant, the ALJ could appropriately assign greater weight to his opinion based on its consistency with the record medical evidence. *See* SSR 96-6P, 1996 WL 374180, at *3 ("In appropriate circumstances, opinions from State agency medical ... consultants and other program physicians ... may be entitled to greater weight than the opinions of treating or examining sources."). The ALJ appropriately rejected a portion of Dr.

Shramowiat's opinion after citing persuasive contrary medical and opinion evidence. *See Coffman*, 829 F.2d at 517. Finally, the ALJ supplied "good reasons" for rejecting that part of Dr. Shramowiat's opinion, and it is sufficiently clear that the ALJ adequately assessed Dr. Shramowiat's opinion as required by the regulations and rulings.

By the same token, the ALJ acted reasonably when he disregarded the portion of Dr. Franyutti's opinion that limited Claimant to lifting and carrying ten pounds; particularly, in light of Claimant's testimony and Dr. Shramowiat's opinion to the contrary. The ALJ is not bound to accept the opinions of any medical source in their entirety, even those sources whose opinions are afforded significant weight. Ultimately, it is the ALJ's duty to make findings that are supported by the evidence as a whole when properly applying the Social Security rulings and regulations. The undersigned **FINDS** that the ALJ fulfilled his duty in this case.

## VIII.   <u>Recommendations for Disposition</u>

Based on the foregoing, the undersigned United States Magistrate Judge respectfully **PROPOSES** that the presiding District Judge confirm and accept the findings herein and **RECOMMENDS** that the District Judge **DENY** Plaintiff's request for judgment on the pleadings, (ECF No. 12), **GRANT** the Commissioner's request for judgment on the pleadings, (ECF No. 13), **AFFIRM** the decision of the Commissioner, **DISMISS** this action, with prejudice, and remove it from the docket of the Court.

The parties are notified that this "Proposed Findings and Recommendations" is hereby **FILED**, and a copy will be submitted to the Honorable Thomas E. Johnston, United States District Judge. Pursuant to the provisions of Title 28, United

States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections) and three days (mailing) from the date of filing this "Proposed Findings and Recommendations" within which to file with the Clerk of this Court, specific written objections, identifying the portions of the "Proposed Findings and Recommendations" to which objection is made, and the basis of such objection. Extension of this time period may be granted by the presiding District Judge for good cause shown. Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. *Thomas v. Arn*, 474 U.S. 140 (1985); *Snyder v. Ridenour*, 889 F.2d 1363 (4th Cir. 1989); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984). Copies of such objections shall be provided to the opposing party, Judge Johnston, and Magistrate Judge Eifert.

The Clerk is directed to file this "Proposed Findings and Recommendations" and to provide a copy of the same to counsel of record.

**FILED**: January 30, 2015

Cheryl A. Eifert
United States Magistrate Judge